1  JOSEPH P. RUSSONIELLO  (CABN 44332)
   United States Attorney
2
   BRIAN J. STRETCH (CABN 163973)
3  Chief, Criminal Division

4  MATTHEW A. PARRELLA (NYBN 2040855)
   JOSEPH A. FAZIOLI
5  Assistant United States Attorneys

6    150 Almaden Blvd., Suite 900
     San Jose, CA 95113
7    Telephone: (408) 535-5042
     FAX: (408) 535-5066
8    matthew.parrella@usdoj.gov
     joseph.fazioli@usdoj.gov
9

10 Attorneys for Plaintiff

11

12                    UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

                         SAN JOSE DIVISION
14

15

16 UNITED STATES OF AMERICA,          )   Case No. CR 06-00424-JW
                                      )
17        Plaintiff,                  )   UNITED STATES' PROFFER OF FBI
       v.                             )   CONTACTS WITH DEFENDANTS
18                                    )   AFTER JULY 29, 2003
   LAN LEE,                           )
19      aka Lan Li, and               )   Trial:      June 18, 2009
                                      )   Time:       8:30 a.m.
20 YUEFEI GE,                         )   Court:  Hon. James Ware
                                      )
21        Defendants.                 )
   _____  )

22 **I.   Introduction**

23        The defendants previously jointly moved to suppress all evidence and any statements

24 obtained during FBI interviews of the defendants on July 29, 2003, as well as any evidence seized

25 during the search of each defendant's home computer on July 29, 2003.  The Court conducted

26 several sessions of evidentiary hearings regarding the defendants' motion.  By order dated October

27 17, 2008, the Court granted the defendants' motion to suppress as part of the Government's case-

28 in-chief statements made to the FBI on July 29, 2003.  The Court also found that the defendants

CR 06-00424 JW
UNITED STATES' PROFFER OF FBI CONTACTS
WITH DEFENDANTS AFTER JULY 29, 2003

1  voluntarily gave their consent to permit the search of their home computers. The Court
2  accordingly denied the defendants' motion to suppress any evidence seized during the search of
3  each defendant's computer on July 29, 2003.

4        In the same October 17, 2008 Order, the Court stated that the United States shall submit a
5  proffer listing any statement which it believes remains admissible. This filing represents the
6  United States' proffer of the defendants' post-July 29, 2003 statements to the FBI which the
7  United States believes remain admissible and (unless otherwise noted) plans to introduce in its
8  case-in-chief. In certain of the conversations listed below, the defendants made self-serving
9  statements which the United States does not plan to offer in case-in-chief and would object to
10  their use at trial by the defense as self-serving hearsay. See United States' Motions in Limine
11  filed on May 29, 2009. The United States also intends to present at trial statements that the
12  defendants made to the FBI on July 29, 2003 which established that the defendants voluntarily
13  gave their consent to permit the search of their home computers.

14  **II.  Lan Lee**

15        The United States is aware of five interactions between Lee and the FBI after Agent
16  Sieber's initial interview with Lee at NetLogic Microsystems headquarters on July 29, 2003.
17  What follows is a summary of the admissible content of the conversations that the United States
18  may seek to introduce at trial in its case-in-trial. In the September 12, 2003 conversation listed
19  below, Lee made self-serving statements which the United States does not plan to offer in its case-
20  in-chief and would object to their use at trial by the defense as self-serving hearsay. See United
21  States' Motions in Limine filed on May 29, 2009.

22  **1.  July 30, 2003**

23  Admissible Content:

24        Agent Sieber had arranged to meet with Lee at his home to drop off the computer that Lee
25  released to the FBI on July 29, 2003. When Agent Sieber arrived, Lee was not at home. He
26  called Lee, and Lee told him that he was delayed at his daughter's swim lesson. Lee agreed to
27  meet Agent Sieber at the FBI's Palo Alto Office to pick up the computer. Agent Sieber and Lee
28  spoke briefly during the exchange at the FBI office, but the conversation was a "discussion of the

1  same exact things [they] had discussed the day before, nothing new."

2  **2.  August 4, 2003**

3  Admissible Content:

4       Lee called Agent Sieber to tell him that the SICO partnership had been formally dissolved,

5  and to offer documentary proof of the dissolution.  Lee came to the FBI's office in Palo Alto and

6  gave Agent Sieber a certificate showing the dissolution of SICO.

7  **3.  August 6, 2003**

8  Admissible Content:

9       Lee called Agent Sieber to tell him that he had just mailed a package to his cousin in

10 China.  He said the package contained fifty face masks for SARS protection as well as a compact

11 disc containing pictures from a previous trip to China.

12      The United States does not anticipate introducing this conversation in its case-in-chief.

13 **4.  September 12, 2003**

14 Admissible Content:

15      Agent Sieber called Lee and asked him if he would be willing to come to the FBI's Palo

16 Alto office to be interviewed.  Lee agreed and came to the office where Agents Sieber and Cano

17 interviewed him.  During the interview, Lee told Agents Sieber and Cano that he:

18 •     participated in the design of the CAM3 chips at NLM as part of his employment;

19 •     was issued a copy of the CAM3 data sheets as part of his work on the project;

20 •     never downloaded any of the data sheets on to his home computer;

21 •     understood NLM's confidentiality policies required that the company's confidential

22     information, including CAM3 data sheets, not be altered or passed to anyone outside of

23     NLM;

24 •     never used, possessed, or altered the CAM3 data sheets outside of NLM workspace;

25 •     had never seen the altered form of the data sheets found on Ge's computer, did not know

26     of Xiadong Yang translating the data sheets before being altered, did not know how

27     NLM's confidential markings had been removed from the data sheets, and did not know

28

why SICO's business name had been inserted into a page of the data sheets;

- recalled participating in the cutting and pasting of portions of an NLM document into SICO's business plan at Ge's home while working with Ge and Yang, but could not remember which NLM document was used;

- took SICO's business plan to China in May 2002, but did not remember taking a translated version of the CAM3 data sheets with him on the trip.

**5.  June 16, 2006**

Agents Sieber, Wislar, Gerges, and Pryzbyla arrested Lee at his home.  Agent Gerges advised Lee of his Miranda rights.  Lee made no statements to the agents.

The United States will not use Lee's refusal to make a statement at the time of his arrest in its case-in-chief.

**III.   Yufei Ge**

The United States is aware of two interactions between Ge and the FBI after Agent Cano's initial interview with Ge at NetLogic Microsystems headquarters on July 29, 2003.  What follows is a summary of the admissible content of these conversations that the United States may seek to introduce at trial in its case-in-trial.  In the September 10, 2003 conversation listed below, Ge made self-serving statements which the United States does not plan to offer in case-in-chief and would object to their use at trial by the defense as self-serving hearsay.  See <u>United States'</u> <u>Motions in Limine</u> filed on May 29, 2009.

**1.  September 10, 2003**

Admissible Content:

Agent Sieber called Ge and asked him if he would be willing to come to the FBI's Palo Alto office to be interviewed.  Ge agreed and came to the office where Agents Sieber and Cano interviewed him.  During the interview, Ge told Agents Sieber and Cano that he:

- was working on NLM's Pegasus chip design in February 2002, and received a hard copy of the Pegasus chip data sheets as part of his work;

- downloaded and installed a copy of the Pegasus chip data sheets on his home computer in

1    August or September of 2002 without authorization from his supervisor;

2  • downloaded copies of both (NSE5512 and NSE5512GLC) CAM3 data sheets and installed

3    them on his home computer in August or September 2002, though he was not working on

4    the CAM3 design teams;

5  • had received an e-mail copy of one of the CAM3 data sheets from his supervisor by e-

6    mail, but never received authorization to install the data sheets on his home computer;

7  • discussed a business venture with Xiadon Yang and Lan Lee in February 2002;

8  • met with Lee and Yang in March 2002 to further discuss the business venture, and Lee

9    stated  during the meeting: "We can use the TCAM design as the basis for our chip's

10    design";

11  • was aware that Lee registered SICO Microsystems Inc. in Delaware in May 2002, and

12    SICO's partners consisted of Ge, Lee, and Yang;

13  • met with Lee and Yang at Yang's home in March 2002 to draft SICO's initial business

14    plan;

15  • brought an electronic copy of the CAM3 data sheets, which were NLM's intellectual

16    property, to the March 2002 meeting at Yang's house with the intent of cutting and pasting

17    portions of the data sheets into the SICO business plan;

18  • knew that text and diagrams from the CAM3 data sheets were in fact cut and pasted into

19    SICO's business plan;

20  • believed that using the CAM3 data sheets gave SICO's business plan a "jumpstart";

21  • had altered the CAM3 data sheets on his home computer by removing all NLM

22    confidential disclaimers throughout the data sheets, and replacing the term

23    "NSS5512GLC" with "SICO" on one page;

24  • understood it was SICO's intent to represent SICO's chip design by using information

25    derived from the CAM3 data sheets;

26  • believed that Lee was aware of the origin of the data sheets they used to create the

27    business plan, because Lee worked with them regularly as part of his employment;

28

1  •   heard Lee suggest that they use portions of the CAM3 data sheets for the SICO business

2      plan during the meeting at Yang's home in March 2002;

3  •   faxed a copy of SICO's business plan to his cousin in China so that his cousin could look

4      for venture capital funding for SICO;

5  •   met with Lee and Yang again at Ge's home in June 2002 to draft a revised version of the

6      business plan;

7  •   was aware that portions of the CAM3 data sheets were again copied into the business plan,

8      which Yang typed because his Mandarin writing skills were the best of the group.

9  **2.**    **June 16, 2006**

10     Agents Monaghan, Tosh, Casey, Wu and Brown arrested Ge at his home. Ge made no

11 statements to the agents.

12     The United States will not use Ge's refusal to make a statement at the time of his arrest in

13 its case-in-chief.

14

15 DATED: June 1, 2009          Respectfully submitted,

16                 JOSEPH P. RUSSONIELLO
                   United States Attorney
17

18

19                     /s/
                   MATTHEW A. PARRELLA

20                 JOSEPH A FAZIOLI
                   Assistant United States Attorneys

21

22

23

24

25

26

27

28

CR 06-00424 JW
UNITED STATES' PROFFER OF FBI CONTACTS
WITH DEFENDANTS AFTER JULY 29, 2003     6